# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### GAINESVILLE DIVISION

JENNIFER HARRIS, *et al.*,      :
                                :
    Plaintiffs,          :
                                :
v.                              :      CIVIL ACTION NO.
                                :      2:17-CV-00235-RWS
SGT. PATRICK TOLEN, *et al.*,   :
                                :
    Defendants.          :
                                :

## ORDER

This case comes before the Court on Defendants' Motion for Summary

Judgment [53].  After reviewing the record, the Court enters the following

Order.

### Background

On the night of June 15, 2017, Jennifer Harris, along with her six-year-

old son, Kenleigh Harris, and cousin, Justin Castillo, were fleeing their home

after a break-in when they were shot in their car by law enforcement officers.

Defendants Brown and Tolan are sergeants with the Hall County

Sheriff's Department.  Around midnight on June 15, they and three deputies

responded to a 911 call of a home invasion in progress.  (Defs.' Statement of

Material Facts ("Defs.' SOF"), Dkt. [53-2] ¶ 1.)  The call came from Stewart

McIntosh.  According to Mr. McIntosh he was in his yard at the time and

personally witnessed the subject incident.  (McIntosh Decl., Dkt. [57-3] at

1–2.)  Thus, there are three perspectives from the night of June 15: (1)

Defendants'; (2) Mr. McIntosh's; and (3) Plaintiffs'.[1]

## I.      Defendants' Perspective

Around midnight, Defendants learned of a possible home invasion in

progress.  (Defs.' SOF, Dkt. [53-2] ¶ 1.)  Dispatch informed them that two

masked men forced their way into a house on Campbell Road in Gainesville,

Georgia and that both suspects were armed—one with an AK-47 assault rifle

and the other with a pistol.  (Id. ¶¶ 2–4.)

Defendants arrived at the scene, accompanied by three deputies.  (Id.

¶¶ 7, 9.)  They were all wearing Sheriff's Department uniforms.  (Id. ¶ 20.)

Approximately 300 yards from the house they stopped and split into two

groups.  (Id. ¶¶ 9–10.)  One group—with two deputies—approached the house

from the back and attempted to make contact with the caller, while the

---

[1]  Defendants have also produced testimony from Joe Gierok, Plaintiffs'
neighbor.  The incident happened in front of Mr. Gierok's house, so his perspective
was similar to Defendants' and his version of the facts largely reflects theirs.

2

other—which included both Defendants and the remaining deputy—continued making its way toward the house. (Id. ¶¶ 10–12.) According to Defendants, Sgt. Brown approached from right side of the road and the deputy from the left, while Sgt. Tolan approached in the middle of the road. (Id. ¶¶ 27–28.)

After several yards, Defendants saw a vehicle's taillight at the residence, and as they continued moving forward, it pulled out of the driveway and began moving slowly down the road, toward the deputies. (Id. ¶¶ 14–15, 21.) The vehicle's headlights were on, and Defendants were unable to see inside because the "headlights were bright." (Id. ¶¶ 16, 18.)

However, "[b]ased on communications from dispatch, the deputies believed that the vehicle could be the suspects trying to get away." (Id. ¶ 24.) And so they decided that it needed to be stopped. (Id. ¶ 25.) According to Defendants, "they turned on their flashlights and walked out into the roadway in an attempt to stop the vehicle." (Id. ¶ 26.) They yelled, "Sheriff's Office! Stop!" But the car did not stop. (Id. ¶¶ 30–31.) Instead, it turned toward Sgt. Brown. (Id. ¶ 34.) And Sgt. Tolan thought it was going to run Brown over. (Id. ¶ 37.) He therefore shot at the vehicle with his rifle to try to stop it. (Id. ¶ 38.)

3

At that point, the vehicle changed direction and started moving toward Sgt. Tolan. (Id. ¶ 39.) Fearful then that he would be run over, Sgt. Tolan fired several more rounds into the hood of the car. (Id. ¶¶ 40–41.)

The car moved past Sgt. Tolan, into a ditch. (Id. ¶ 43.) It then went back onto the road and rolled a bit farther before coming to a stop. (Id. ¶¶ 44, 52.) Unbeknownst to Defendants, it was Plaintiff Jennifer Harris—trying to escape from the suspects with her son and cousin—who was actually driving the vehicle. (Id. ¶¶ 22–23, 42.) Fortunately, they all survived. (Id. ¶¶ 54–55.)

## II.  Mr. McIntosh's Perspective[2]

Mr. McIntosh is Jennifer Harris's fiancé. (Harris Dep., Dkt. [55-1] at 8.)[3]  On June 15, he was able to escape the house with two children. (Id. at 77.) Mr. McIntosh then stood in the yard of Plaintiffs' house and called 911 to report the break-in. Still on the call, he saw a gray Audi leaving the house. He informed the operator that it was Plaintiffs' car. After reaching the road, the

---

[2] Unless otherwise noted, these facts are taken entirely from Mr. McIntosh's Declaration, which is attached as an exhibit to Plaintiffs' response brief. (Dkt. [57-3] at 18–22.)

[3] Whenever the Court cites to Ms. Harris's deposition in this Order, the page number provided corresponds with the page numbers that appear on the deposition transcript, not the CM/ECF header.

4

car turned north.  It moved "slowly" and, after about 20 feet, came to a "rolling stop."  Mr. McIntosh then saw three officers approaching the front of the vehicle from the grass to the side of the road.  More precisely, Mr. McIntosh saw the officers' flashlights and deduced they were law enforcement because the 911 operator said they were at the scene.  According to Mr. Mcintosh, "The car's headlight [sic] were on low beam and did not shine on the officers."

Two of the officers then crossed to the opposite side of the road.  Those officers continued to approach the vehicle, "straddling the grass."  Then one of them started shooting at the vehicle, and the third officer (who had not crossed the road) "also fired a shot at the driver side."  According to Mr. McIntosh, the vehicle did not make any movement—toward the officers or otherwise—before the shots were fired.  But after the vehicle was shot, the driver "appeared to have lost control."  The car went off the side of the road, then back onto it.  After that, the car moved another 50 yards down the road until coming to a stop.

## III.   Plaintiffs' Perspective

Nearing midnight, Plaintiff Jennifer Harris and her family were at home getting ready for bed when they heard a loud knock on the door.  (Harris Dep.,

5

Dkt. [55-1] at 73–74.) Ms. Harris's cousin went to see who it was, and a masked man armed with a rifle forced his way into the house. (Id. at 75, 78–79, 82; Castillo Dep., Dkt. [55-2] at 60.) The robber pointed his gun at Ms. Harris and grabbed her cell phone. (Harris Dep., Dkt. [55-1] at 78.) Then he started demanding, "Give me what you got," while a second man—also masked and armed with a pistol—stood at the doorway. (Id. at 79–80.) About two minutes later, they left. (Id. at 81.)

Ms. Harris checked to see if everyone was okay, and after about 30 minutes decided to go to a relative's house, down the street. (Id. at 84–85, 89, 92–93.) She packed everyone into her car—a gray Audi—backed out of the driveway, and started driving slowly (about 5 miles per hour) down the road. (Id. at 93, 98.) She saw three figures moving "directly towards [her] car" who were holding flashlights that were "blinding" her. (Id. at 99.) Two of the figures then crossed the road in front of the car, and as they did Ms. Harris heard, "Stop." (Id. at 100.) She saw the barrel of a gun. (Id. at 102.) Then, from the backseat, Kenleigh Harris yelled, "Mom that's them." (Id.)

Ms. Harris went "to put [the] brakes on," and there was a gunshot. (Id. at 102, 104.) The first shot hit her head. (Id. at 104.) And from that point, she

6

doesn't remember much; just trying to stay on the road.  (Id.)

## IV.    The Lawsuit

Plaintiffs Jennifer Harris—on behalf of herself and her son Kenleigh Harris—and Justin Castillo filed this lawsuit on November 11, 2017, against Sgt. Tolan and Sgt. Brown.  According to Plaintiffs, Defendants' use of force on the night of June 15 was excessive and unlawful, making them liable for the injuries Plaintiffs sustained.  Plaintiffs assert claims under federal law for violations of their rights under the Fourth and Fourteenth Amendments and for related claims under Georgia law.  Defendants now move for summary judgment.

## Discussion

## I.    Legal Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits,

if any, which it believes demonstrate the absence of a genuine issue of material fact.'" <u>Hickson Corp. v. N. Crossarm Co.</u>, 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 257 (1986).

The applicable substantive law identifies which facts are material. <u>Id.</u> at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. <u>Id.</u> An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Id.</u> at 249-50.

Finally, in resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. <u>Patton v. Triad Guar. Ins. Corp.</u>, 277 F.3d 1294, 1296 (11th Cir. 2002). But, the court is bound only to draw those inferences that are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."

8

Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

"If the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted." Anderson, 477 U.S. at 249–50 (internal citations

omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met

its burden under Rule 56(a), the nonmoving party "must do more than simply

show there is some metaphysical doubt as to the material facts").

## II.     Section 1983 & Qualified Immunity

Plaintiffs assert a claim against Defendants under 42 U.S.C. § 1983 for

excessive force in violation of the Fourth and Fourteenth Amendments.

Defendants argue they are entitled to qualified immunity on that claim.[4]

To begin, Plaintiffs take the position that qualified immunity should be

"a legally impermissible defense" against § 1983 claims "except as applied to

---

[4] Defendants initially argued that Plaintiffs' claims against Sgt. Brown failed because there was no evidence that he ever fired any shots at the vehicle. With the introduction of Stewart McIntosh's declaration, however, there is—at least arguably—a genuine issue of material fact as to whether Sgt. Brown discharged his weapon. Accordingly, for the purposes of summary judgment, the Court proceeds under the assumption that both Defendants used force and proceeds to analyze whether they are otherwise shielded from liability under the doctrine of qualified immunity.

9

state actors protected by immunity in 1871," the year the law was enacted. (Resp. to MSJ, Dkt. [57-3] at 3.) In doing so, Plaintiffs ask the Court to ignore more than 60 years of doctrinal development—development, the Court might add, that is the result of dozens of Supreme Court Justices' collaboration and decision-making (not to mention the many more judges on lower courts across the country). That is not how the judiciary works. Thus, the Court's declines Plaintiffs' invitation.[5]

Instead, the Court will proceed—as it is bound to do—on the course set by previous (and binding) decisions which—significant for purposes here—recognize qualified immunity for law enforcement officers who are sued under § 1983 in certain instances. See, e.g., Plumhoff v. Rickard, 572 U.S. 765 (2014); Messerschmidt v. Millender, 565 U.S. 535 (2012); Pearson v. Callahan, 555 U.S. 223 (2009); Scott v. Harris, 550 U.S. 372 (2007); Brosseau v. Haugen, 543 U.S. 194 (2004) (per curiam); Ruiz v. Town of Indian Shores, 390 F. App'x 864 (11th Cir. 2010); Crenshaw v. Lister, 556 F.3d 1283 (11th Cir. 2009); Buckley v. Haddock, 292 F. App'x 791 (11th Cir. 2008).

---

[5] Plaintiffs also have not explained why—or even directly argued that—this approach would preclude law enforcement officers like Sgt. Brown and Sgt. Tolan from successfully raising the defense of qualified immunity.

A.     Qualified Immunity Standard

"Qualified immunity offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Sherrod v. Johnson, 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  To claim qualified immunity, a defendant must first show he was performing a discretionary function.  Moreno v. Turner, 572 F. App'x 852, 855 (11th Cir. 2014).  "Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply." Edwards v. Shanley, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting Lewis v. City of W. Palm Beach, 561 F.3d 1288, 1291 (11th Cir. 2009)).  A plaintiff demonstrates that qualified immunity does not apply by showing: "(1) the defendant violated a constitutional right, and (2) the right was clearly established at the time of the alleged violation."  Moreno, 572 F. App'x at 855.

As an initial matter, the Court concludes that Defendants were acting pursuant to their discretionary authority as law enforcement officers when the events at issue occurred.  See, e.g., Kesinger ex rel. Estate of Kesinger v.

11

Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004) (officer's use of deadly force in altercation with defendant was clearly within the scope of his discretionary authority). Thus, there are two remaining inquiries: whether the undisputed facts show a violation of Plaintiffs' constitutional rights and, if so, whether those rights were clearly established at the time in question.

B.    Constitutional Violation: Excessive Force

A "use of force" claim brought against law enforcement officers is "analyzed under the Fourth Amendment reasonableness test." Wells for Chambers v. Talton, 695 F. App'x 439, 444 (11th Cir. 2017) (citing Graham v. Connor, 490 U.S. 386, 395 (1989)). The test is an objective one. The Court must ask whether the officer's conduct is objectively reasonable in light of the facts and circumstances confronting him, regardless of underlying intent or motive. Kesinger, 381 F.3d at 1248. Of course, this involves "careful attention to the facts and circumstances" faced by the officer. Graham, 490 U.S. at 396. And—because hindsight is 20/20—it also requires setting aside any after-the-fact assessments to instead judge the officer's conduct "from the perspective of a reasonable officer on the scene[.]" Kesinger, 381 F.3d at 1248.

In this case, then, the Court must decide "whether a reasonable officer"

12

in Defendants' shoes would have thought that the level of force they used—*i.e.*, potentially deadly force (or, specifically, firing at Plaintiffs' vehicle)—was "necessary in the situation at hand." Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002). The Eleventh Circuit has held that the use of such force is justified when the officer "(1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others . . .; (2) reasonably believes that the use of deadly force was necessary to prevent escape; *and* (3) has given some warning about the possible use of deadly force, if feasible." Talton, 695 F. App'x at 444 (quoting Vaughan v. Cox, 343 F.3d 1323, 1329 (11th Cir. 2003) (alteration and emphasis in original)); accord Tennessee v. Garner, 471 U.S. 1, 11–12 (1985). However, "failure to give a warning," alone, "does not preclude summary judgment" so long as "the facts otherwise indicate that the officer's use of force was reasonable." Talton, 695 F. App'x at 444.

The Court finds that Defendants' use of force was objectively reasonable under the circumstances. On the night of June 15, they were responding to a report of a home invasion in progress and advised that one suspect was armed with an AK-47 assault rifle and another suspect with a pistol. When

13

Defendants arrived at the scene, they saw a vehicle leaving the house. It began

moving in their direction, and according to Defendants, they could not see

inside. Defendants then ordered the car to stop. But it did not. And Ms.

Harris, herself, admits that, although she could not tell Defendants were police

officers, she did hear someone say "stop." Thus, from Defendants' perspective,

it was reasonable to believe that the driver was refusing to obey their

command.

There is also nothing suggesting that Defendants had reason to suspect

that the burglars were not driving the car. According to Mr. McIntosh, he told

the 911 operator that Plaintiffs owned a gray Audi and that he saw that car

leaving the house. Yet, there is no evidence indicating that this information

was ever conveyed to Defendants.[6] And even if it were, Mr. McIntosh did not

say that *Plaintiffs* were in the vehicle, just that he saw it leaving. It is therefore

---

[6] In their response to Defendants' statement of undisputed material facts, Plaintiffs attempt to put this fact in dispute by asserting that "Defendants were informed that the family owned a grey Audi." (Dkt. [57-1] ¶ 24.) But the only evidence Plaintiffs cite in support of this "disputed" fact are Mr. McIntosh's declaration and (broadly) "Tolen [sic] audio." (Id.) Mr. McIntosh did not speak to Sgt. Tolan or Sgt. Brown, and he would not have personal knowledge of what the 911 dispatcher told them. Nor does the audio recording in any way prove that Defendants knew Plaintiffs were driving the vehicle or that the burglars were not.

14

not plausible to infer that Defendants knew Plaintiffs were in the car, or that Defendants had any reason to suspect the burglars were not. To the contrary, Defendants testified that they were "not able to see inside the vehicle," and did not know who was inside.

Accordingly, when Defendants shot at the car they had probable cause to believe it was being driven by the burglars, that they were attempting to flee the scene, and that both of them were armed—one with an AK-47. It was further reasonable, then, to believe that the individuals in the car posed a threat to the public. And given that the driver disobeyed Defendants' orders, a reasonable officer on the scene could have believed that resorting to deadly force was necessary to prevent escape and future danger to others.

The Eleventh Circuit when faced with similar facts—and perhaps even more egregious ones—has reached the same conclusion. For example, in Long v. Slaton, 508 F.3d 576 (11th Cir. 2007), a father called the police to assist with one of his son's "psychotic episodes." When the deputy arrived at the scene, he exited his cruiser and left the keys in the ignition. Id. at 578. The deputy told the son that he was being taken into custody, and the son "voiced disagreement." Id. at 579. The son then ran to the deputy's unattended cruiser,

got inside, and closed the door.  Id.  The deputy drew his pistol and threatened

to shoot the son if he did not exit the vehicle.  Id. When the son did not comply,

but instead started backing the cruiser down the driveway, the deputy fired

three shots, killing the son.  Id.  The Eleventh Circuit found the deputy's use of

force objectively reasonable under the circumstances.  Even accepting there

was no immediate threat to the deputy because the cruiser was moving away

from him—though simultaneously acknowledging that the son could have

easily changed direction at any time, id. at 581 n.7—the court found deadly

force justified given the potential dangers posed by the son if he were to flee in

the police cruiser.  Id. at 581.  And the court emphasized that "officers in a

tense and dangerous situation" are not required "to wait until the moment a

suspect uses a deadly weapon to act to stop the suspect."  Id.; see also Pace v.

Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002) (reversing denial of

summary judgment because officers did not use excessive force in shooting a

suspect who had stopped his vehicle after a high-speed chase, even accepting

for purposes of summary judgment that the suspect had neither aimed the

vehicle at the officers nor attempted to run them over).

    The Eleventh Circuit also more recently found an officer's use of deadly

force objectively reasonable where the officer mistakenly believed the decedent had "committed the serious crime of burglary during which a loaded .45 caliber gun was stolen." Talton, 695 F. App'x at 444. And in reaching that decision, the court referenced the pragmatic reality in these types of cases that an officer's mistake about a suspect being armed "does not defeat qualified immunity." Id. at 444 n.2 (citing Penley v. Eslinger, 605 F.3d 843, 854 (11th Cir. 2010) (finding that officer's use of deadly force was reasonable where suspect held a toy gun modified to look like a real gun)).

Like the Eleventh Circuit in those cases, this Court also finds that based on the evidence in the record—viewed in the light most favorable to Plaintiffs[7]—Defendants' use of force did not violate Plaintiffs' Fourth

---

[7] In construing the facts this way, the Court has stretched the words of Stewart McIntosh as far as they may go. That is to say, the Court has credited the entirety of his declaration, even when inconsistent with the bulk of evidence presently before the Court, including in some instances Mr. McIntosh's own prior statement to police. Compare Johnson v. Niehus, 491 F. App'x 945, 950 (11th Cir. 2012) (rejecting plaintiff's testimony at summary judgment because it was largely refuted by the record, including "physical evidence found at the scene—evidence which corroborate[d] the defendant officers' accounts of what happened during the incident."). Though somewhat difficult to reconcile, the Court has undergone this exercise for the purpose of showing that, even with the benefit of dubious testimony, Plaintiffs simply cannot prevail on their constitutional claims. To that end—the Court should add—were Mr. McIntosh's testimony discounted, the remaining evidence would seem to establish that the car was in fact moving toward one or more officers before Defendants fired, and if so, Plaintiffs' case would fall into a catalogue of others

Amendment rights.  As a result, Defendants are entitled to qualified immunity.

C.     Clearly Established Law

Even assuming Plaintiffs could show a violation of their rights under the

Fourth Amendment, they would also have to show that Defendants' use of

force violated clearly established law to overcome qualified immunity.  A

constitutional right is clearly established "only if its contours are 'sufficiently

clear that a reasonable official would understand what he is doing violates that

right.'"  Vaughan v. Cox, 343 F.3d 1323, 1332 (11th Cir. 2003) (quoting

Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  While the fact patterns of

---

that have been summarily dismissed.  McCullough v. Antolini, 559 F.3d 1201, 1202
(11th Cir. 2009) (deadly force justified "in a split-second situation where a suspect
late at night refused to pull over, engaged in a high-speed chase, and then, after
pulling over, repeatedly refused to show his hands or respond to officers, revved his
engine, and then drove his truck toward the deputy standing in a nearby lot"); Troupe
v. Sarasota Cty., 419 F.3d 1160, 1168 (11th Cir. 2005) (reasonable officer could have
believed the decedent posed a threat of serious physical harm when the officer was
directly in the decedent's path as his car accelerated toward the officer who had only
three to five seconds to assess the situation before shooting); Robinson v. Arrugueta,
415 F.3d 1252, 1255-56 (11th Cir. 2005) (qualified immunity for officer who used
deadly force against suspect driving a vehicle that was advancing towards officer at
one or two miles per hour); Johnson, 491 F. App'x at 952–53 (use of deadly force
objectively reasonable where driver ignored repeated commands by the officers, tried
to roll up the windows while the officers were in harm's way, revved the engine and
threw the vehicle into reverse while the officers' arms and hands were in the vehicle);
see also Long, 508 F.3d at 581; Pace, 283 F.3d at 1282 (deadly force constitutional
where the decedent would have appeared to have been gravely dangerous based on his
hazardous driving during a vehicle chase, and failure to heed police warning).

AO 72A
(Rev.8/82)

prior cases used to show that a right is clearly established need not be "fundamentally similar" or even "materially similar," the salient question is whether the law at the time of the alleged violation gave officials "fair warning" that their acts were unconstitutional. Holmes v. Kucynda, 321 F.3d 1069, 1078 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 740 (2002)). Sometimes "broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts," but more often than not, "the facts are so material to the violation at issue that such generalized principles are insufficient." Bashir v. Rockdale Cty., 445 F.3d 1323, 1331 (11th Cir. 2006) (internal quotation and citation omitted).

Plaintiffs argue that Defendants "falsif[ied] facts" to manufacture probable cause, which—according to Plaintiffs—has long been "patently unconstitutional." But that's the first time such a theory has been mentioned in this litigation. Plaintiffs' Complaint does not suggest that Defendants lied or manipulated evidence in violation of Plaintiffs' constitutional rights; in fact, Plaintiffs' Complaint includes no allegations, whatsoever, related to Defendants' conduct after the incident. The Eleventh Circuit has explained, in

19

no uncertain terms, that plaintiffs are not permitted to raise new claims at summary judgment. Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314–15 (11th Cir. 2004); see also Flintlock Const. Servs., LLC v. Well-Come Holdings, LLC, 710 F.3d 1221, 1227–28 (11th Cir. 2013) (admonishing some district courts' practice of ignoring "what the respective parties alleged in their complaint and answer" and considering "their claims and defenses as depicted in the memoranda they file[] in support of or in opposition to a motion for summary judgment.").[8]

And Plaintiffs have not otherwise established that Defendants were on fair notice that the level of force they used was unconstitutional. There is no "controlling and materially similar case declar[ing] the [officer's] conduct unconstitutional[.]" Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000). Indeed, the only case cited by Plaintiff, Ayers v. Harrison, 650 F.

_____

[8] Even were this argument properly before the Court, Plaintiffs have fallen far short of carrying their burden to show that the "state of the law . . . gave [Defendants] fair warning that their alleged [conduct] was unconstitutional." Hope v. Pelzer, 536 U.S. 730, 741 (2002). In fact, it is not entirely clear what conduct Plaintiffs' are claiming is unconstitutional in the first place—not to mention, what injury Plaintiffs suffered as a result of it. Falsification of evidence is typically used as a basis for malicious prosecution claims. See, e.g., Riley v. City of Montgomery, 104 F.3d 1247 (11th Cir. 1997); Baker v. City of Hollywood, 391 F. App'x 819 (11th Cir. 2010). But here, Plaintiffs have provided no evidence capable of sustaining such a claim.

App'x 709 (11th Cir. 2016) is factually distinguishable in several critical ways. Notably, in <u>Ayers</u> there was (1) no probable cause to believe that the suspect was involved in a crime or was armed or dangerous, and (2) the officer was in plain clothes and did not identify himself as a police officer before exiting an unmarked car and approaching the suspect with his gun drawn. <u>Ayers</u>, 650 F. App'x at 712, 715. Those are not the facts presently before the Court.

Plaintiffs have therefore failed to show that the law was developed in such way that it gave Defendants fair warning that the use of deadly force was unconstitutional under the circumstances they encountered—*i.e.*, a car leaving the scene of a burglary, where a reasonable belief existed that the car contained fleeing felons armed with firearms, including an AK-47. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' § 1983 claim.

## II.    State Law Claim for Assault & Battery

Plaintiffs filed a claim for assault and battery against Defendants under Georgia law. Defendants argue that claim fails on the merits and, alternatively, that it is barred by official immunity.

Under Georgia law, state and local officials may be liable for their discretionary acts only "if they act with actual malice or with actual intent to

21

cause injury." See GA. CONST. art. I, § II, ¶ IX(d); <u>Gilbert v. Richardson</u>, 452

S.E.2d 476, 483 (Ga. 1994). "[I]n the context of official immunity, actual

malice means a deliberate intention to do a wrongful act." <u>Adams v.

Hazelwood</u>, 520 S.E.2d 896, 898 (Ga. 1999).

Here, the evidence does not support a finding that Defendants' use of

force was performed with actual malice or a deliberate intent to cause injury.

The evidence shows that Defendants believed firing at the vehicle was

necessary to stop it and prevent death or serious bodily harm to others.

Plaintiffs have not presented any evidence creating a genuine issue of material

fact that Defendants' conduct was the result of actual malice or the intent to

cause Plaintiffs harm. They have therefore failed to carry their burden for

overcoming official immunity. Accordingly, Defendants are entitled to

summary judgment on Plaintiffs' state law claim.

## III.    Punitive Damages

Given the Court has granted summary judgment on all of Plaintiffs'

substantive counts, Plaintiffs' claim for punitive damages too must fail. <u>See,

e.g.</u>, <u>Wood v. Archbold Med. Ctr., Inc.</u>, 738 F. Supp. 2d 1298, 1371 (M.D. Ga.

2010) ("Georgia courts have consistently recognized that a claim for punitive

damages is effective only if there is a valid claim for actual damages to which it could attach, and that punitive damages may not be recovered if there is no entitlement to compensatory damages." (collecting cases)).

## Conclusion

For the reasons described above, Defendants' Motion for Summary Judgment [53] is **GRANTED**. Plaintiffs' claims are **DISMISSED**, and the Clerk is **DIRECTED** to close the case.

**SO ORDERED**, this 12th day of March, 2019.

_____
**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)